2003 WL 22439878                                                                                           Page 2
--- F.Supp.2d ---
**(Cite as: 2003 WL 22439878 (S.D.Ohio))**

H
Only the Westlaw citation is currently available.

United States District Court,
S.D. Ohio,
Eastern Division.

OWNER-OPERATOR INDEPENDENT DRIVERS
ASSOCIATION, INC., et al., Plaintiffs,
v.
ARCTIC EXPRESS, INC., et al., Defendants.

No. 97-CV-750.

Oct. 22, 2003.

Owner-operators of trucks filed class action against motor carrier and truck-tractor lessor alleging that lease arrangements violated truth-in-leasing regulations. Defendants moved for reconsideration of previous decision granting summary judgment on liability, 270 F.Supp.2d 990, and plaintiffs moved for partial summary judgment on issue of damages. The District Court, Marbley, J., held that: (1) intervening decision of Court of Appeals in another circuit did not require reconsideration of earlier decision; (2) court's prior decision did not involve clear error of law requiring reconsideration; (3) supplemental declaration attached to reply memorandum would not be stricken; (4) owner-operators were entitled to only net balance in escrow accounts, not full amount contributed to accounts, even though carrier's failure to keep proper records made accurate determination of that amount impossible.

Motions denied.

**[1] Federal Civil Procedure** 928

170Ak928 Most Cited Cases

As a general principle, motions for reconsideration are granted if the moving party demonstrates: (1) a clear error of law; (2) newly discovered evidence that was not previously available to the parties; or (3) an intervening change in controlling law.

**[2] Courts** 96(5)
106k96(5) Most Cited Cases

Intervening decision of Court of Appeals in another circuit was not binding on district court and thus did not require reconsideration of district court's earlier decision.

**[3] Federal Civil Procedure** 928
170Ak928 Most Cited Cases

On motion for reconsideration, defendants were not entitled to relitigate arguments already considered and rejected by district court absent clear error of law.

**[4] Automobiles** 60
48Ak60 Most Cited Cases

Interstate Commerce Commission Termination Act (ICCTA) had no impermissible retroactive effect, despite fact that it created private cause of action for truck owner-operators to enforce Truth-in-Leasing regulations requiring motor carriers to return escrow funds within 45 days, as it simply shifted the power to bring carrier into court from the Interstate Commerce Commission (ICC) to the owner-operators themselves when public enforcement on complaint of owner-operators ceased. 49 U.S.C.A. § § 14101-02, 14704.

**[5] Federal Civil Procedure** 173
170Ak173 Most Cited Cases

Mere fact that Court of Appeals in another circuit, in addressing similar set of circumstances and issues regarding class certification, reached opposite conclusion was insufficient to show that district court clearly erred in certifying class, and thus intervening decision was not ground for decertification.

**[6] Federal Civil Procedure** 921
170Ak921 Most Cited Cases

All affidavits in support of a motion must be submitted with the motion unless the court, for cause shown, permits a later filing. Fed.Rules Civ.Proc.Rule 6(b,d), 28 U.S.C.A.; Local Rule Civ. 7.2(E).

**[7] Federal Civil Procedure** 921
170Ak921 Most Cited Cases

Purpose of requirement that cause be shown for affidavits not attached to the original motion is to prevent the moving party from springing new facts on the nonmoving party when it is too late to contest

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

them. Fed.Rules Civ.Proc.Rule 6(b,d), 28 U.S.C.A.; Local Rule Civ. 7.2(E).

**[8] Federal Civil Procedure** 🔑2536.1
170Ak2536.1 Most Cited Cases

Supplemental declaration attached to reply brief on motion for summary judgment on damages that merely made ministerial adjustment to reduce damages figure to account for class members who had opted out was not filed "in support" of motion and thus was not subject to being stricken as new matter filed without court approval after original motion, particularly where filing in no way prejudiced opposing party. Fed.Rules Civ.Proc.Rule 6(b,d), 28 U.S.C.A.; Local Rule Civ. 7.2(E).

**[9] Damages** 🔑125
115k125 Most Cited Cases

Measure of damages, in suit for violation of truth-in-leasing regulations in which owner-operators should have received net balance of their maintenance escrow accounts within 45 days of termination of their respective truck leases, was unrecovered amounts remaining in the maintenance escrows at the time of termination for each owner-operator.

**[10] Damages** 🔑6
115k6 Most Cited Cases

Wrongdoer should bear the burden of uncertainty as to damages when the uncertainty is a result of the wrongdoer's own wrongful conduct.

**[11] Damages** 🔑125
115k125 Most Cited Cases

Truck owner-operators were entitled to only net balance in maintenance escrow accounts, not full amount contributed to accounts, even though lessor's and motor carrier's failure to keep proper records and promptly remit funds at termination of leases made accurate determination of actual account balances impossible; principle that wrongdoer should bear burden of uncertainty as to damages when uncertainty is due to wrongdoer's conduct could not be used offensively to entitle owner-operators to recover full amount.

**[12] Damages** 🔑184
115k184 Most Cited Cases

Plaintiffs need not prove the amount of damages with mathematical certainty.

**[13] Damages** 🔑189
115k189 Most Cited Cases

Although defendants' failure to keep proper records made it impossible for plaintiffs to determine amount due with certainty, defendants' wrongdoing could not relieve plaintiffs of responsibility of proving their damages, although it might entitle them to favorable inferences based on uncertainties created by defendants' wrongdoing.

Gregory Michael Cork, The Cullen Law Firm, Washington, DC, James Burdette Helmer, Jr., Helmer Martins & Morgan, Cincinnati, OH, Joyce E. Mayers, Paul D. Cullen, Sr., Thomas Patrick McCann, The Cullen Law Firm Washington, DC, Paul Bryan Martins, Helmer Martins and Morgan, Cincinnati, OH, for Plaintiffs/Counter Defendants.

A. Charles Tell, Mark Alan Johnson, Thomas Leslie Long, Baker & Hostetler, Columbus, OH, for Defendants/Counter Claimants.

*OPINION AND ORDER*

ALGENON L. MARBLEY, District Judge.

**I. INTRODUCTION**

 *1 This case is a class action involving escrow funds that violated the truth-in-leasing regulations. This matter is before the Court on three Motions filed by the Defendants Arctic Express, Inc. ("Arctic") and D & A Associates, Ltd. ("D & A") and one Motion filed by the Plaintiffs. The Defendants' Motions are (1) a Motion for Reconsideration of the Court's July 11, 2003, Order Denying Defendants' Motion for Partial Summary Judgment; (2) a Motion to Decertify the Class; and (3) a Motion to Strike the Supplemental Declaration of Timothy Brickell. The Plaintiffs' Motion is for Summary Judgment on Damages.

 For the following reasons, the Court **DENIES** the Defendants' Motion for Reconsideration; **DENIES** the Defendants' Motion to Decertify the Class; **DENIES** the Defendants' Motion to Strike; and **DENIES** the Plaintiff's Motion for Summary Judgment on Damages.

**II. BACKGROUND** [FN1]

 In June 1997, the Plaintiffs filed this action asserting, *inter alia,* that Arctic and D & A had violated the

truth-in-leasing regulations by failing to return escrow funds collected from independent truck drivers ("owner-operators") for the sole purpose of satisfying their maintenance obligations for equipment leased from D & A. On September 4, 2001, the Court certified a class, defined as follows:

> All independent truck owner-operators who have (1) entered agreements with Defendant D & A Associates, Ltd., which purport to lease, with the option to purchase, trucking equipment under the terms of D & A's equipment lease/purchase agreement, and (2) leased that equipment to Defendant Arctic Express, Inc. under the terms of Arctic's federally-regulated motor carrier lease agreement.

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Arctic Express, Inc .,* Case No. C2: 97-CV-00750, 2001 U.S. Dist. LEXIS 24963, at *16 (S .D.Ohio. Sept. 4, 2001).

This Court has already determined that the nine cents per mile collected for the purpose of maintaining leased equipment was an "escrow fund" as defined by the truth-in-leasing regulations, and that this maintenance escrow fund was subject to the requirements of the federal leasing regulations. *See Owner- Operator Indep. Drivers Ass'n, Inc. v. Arctic Express, Inc.,* 87 F.Supp.2d 820, 830-31 (S.D.Ohio 2000). Further, the Court has concluded that the Defendants' failure to return the maintenance escrow funds to class members whose agreements did not run full term constituted an early termination penalty in violation of 49 C.F.R. § 376.12(k). *See Arctic Express,* 159 F.Supp.2d at 1076 (finding that the Defendants had "absconded with the Plaintiffs' escrow funds"). Having thus granted summary judgment to the Plaintiffs on the issue of liability, the sole issue remaining for trial is damages. [FN2]

On August 21, 2003, the Eighth Circuit issued an opinion, *Owner-Operator Independent Drivers Ass'n, Inc. v. New Prime, Inc.,* 339 F.3d 1001 (8th Cir.2003). The Eighth Circuit made two holdings that are relevant here. First, the court held that the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § § 14101-02 and 14704, under which the Plaintiffs bring their claims, may not be retroactively applied to agreements entered into before its effective date of January 1, 1996. *Id.* at 1007. Second, the court affirmed the denial of class certification in that case, finding that class issues did not predominate where each individual class member's account would need to be examined to determine damages, including set-offs. *Id.* at 1012.

*2 In its March 3, 2000, Opinion and Order, [FN3] this Court relied on a previous Eighth Circuit decision in the *New Prime* case. *Arctic Express,* 87 F.Supp.2d at 824-25, 831-32 (relying on *Owner-Operator Indep. Drivers Ass'n, Inc. v. New Prime, Inc.,* 192 F.3d 778 (8th Cir.1999)). The Court specifically noted that both the legal issues and the facts of the two cases were similar. *Id.* at 824-25.

The Defendants now seek to have this Court revisit two of its previous decisions on the basis of the new opinion in the *New Prime* case. First, the Defendants seek reconsideration of the Court's July 11, 2003, Opinion and Order denying the Defendants' Motion for Partial Summary Judgment. In that Motion, the Defendants sought summary judgment on the claims of all class members, including class representative Carl Harp, whose claims were based on lease-purchase agreements entered into with D & A before January 1, 1996. The Court denied the Defendants' Motion, holding that the provisions of the ICCTA relied upon by the Plaintiffs have no retroactive effect. The Court's reasoning, in essence, was that the ICCTA did not take away nor impair a vested right, nor create a new obligation or duty, nor attach a new disability, since it merely created a private right of action for violations that could already have been enforced in court by the Interstate Commerce Commission ("ICC"). This holding is contrary to the August 21, 2003, holding of the Eighth Circuit Court of Appeals that the ICCTA, by expanding the class of plaintiffs who may bring claims, altered the motor carriers' substantive rights, thereby having a retroactive effect.

The second decision that the Defendants seek to change is the Court's September 4, 2001, Opinion and Order granting the Plaintiffs' Renewed Motion for Certification of Class. The Defendants argue that the Eighth Circuit's decision upholding denial of class certification in a very similar case is directly on point and requires this Court to decertify the class here. The Defendants contend that here, as in *New Prime,* the existence of individual issues regarding proof of the Plaintiffs' damages, including determination of the balance of escrow accounts after offsets, establishes that common issues do not predominate within the meaning of Rule 23(b)(3).

Also before the Court is the Plaintiffs' Motion for Summary Judgment on the issue of damages. The Plaintiffs argue that they are entitled, as a matter of law, to recover the full amount deposited by class members in their maintenance escrow funds because the Defendants failed to comply with the regulatory

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

requirement that they account for expenses deducted from those funds. The Plaintiffs contend that, as a result of the Defendants' wrongdoing, they are incapable of proving the amount of their damages with certainty. They argue that the Defendants must bear the burden of this uncertainty.

In the Plaintiffs' Motion for Summary Judgment on Damages, the Plaintiffs sought judgment against the Defendants in the amount of $16,805,388 plus interest of $6,035,196, for a total of $22,840,584. In submitting their Reply to Defendants' Opposition to Motion for Summary Judgment on Damages, the Plaintiffs amended their requested recovery to $16,464,876, with interest of $5,922,386, for a total of $22,387,262. In support of this emendation, the Plaintiffs submitted a Supplemental Declaration of Timothy Brickell. The Court, in its April 28, 2003, Order, had set July 31, 2003, as the deadline for class members to opt out of participation in this case. According to Brickell's Supplemental Declaration, the Plaintiffs' counsel, as of August 7, 2003, had received 13 executed exclusion forms. Brickell computed the total maintenance contribution of those 13 class members, which he then deducted from the original figure of $16,805,388 to arrive at $16,464,876. The Plaintiffs' Reply, filed on August 11, 2003, was the Plaintiffs' first submission to the Court following the July 31, 2003, deadline.

**\*3** After receiving the Plaintiffs' Reply to Defendants' Opposition to Motion for Summary Judgment on Damages, the Defendants filed a Motion to Strike the Supplemental Declaration of Timothy Brickell. In support of that Motion, the Defendants argue that Local Rule 7.2(E) and Rule 6 of the Federal Rules of Civil Procedure require that any affidavit in support of a motion be submitted with the party's primary memorandum in support of that motion. The Defendants contend that affidavits attached to a reply memorandum are only permissible to the extent they rebut issues raised in opposition to the motion. Since the Supplemental Declaration of Timothy Brickell raised new issues, the Defendants argue, it should be struck.

### III. ANALYSIS

#### A. Motion for Reconsideration

*1. Standard of Review*

[1] As a general principle, motions for reconsideration are granted if the moving party demonstrates: (1) a clear error of law; (2) newly discovered evidence that was not previously available to the parties; or (3) an intervening change in controlling law. *GenCorp ., Inc. v. Am. Int'l Underwriters, 178 F.3d 804, 834 (6th Cir.1999)*. Motions for reconsideration do not allow the losing party to "repeat arguments previously considered and rejected, or to raise new legal theories that should have been raised earlier." *Nat'l Metal Finishing Co. v. BarclaysAmerican/ Commercial, Inc., 899 F.2d 119, 123 (1st Cir.1990)*; *see also Am. Marietta Corp. v. Essroc Cement Corp.,* Case No. 01-3752, 2003 U.S.App. Lexis 3211, at \*9 (6th Cir. Feb. 19, 2003) (motion for reconsideration "should not be used to re-litigate issues previously considered").

*2. Analysis*

The Defendants argue that the August 21, 2003, Eighth Circuit decision establishes both a "clear error of law" and an "intervening change in controlling law." When this Court made its decision on the retroactive effect of the ICCTA, the only courts that had spoken on the issue were two district courts, both of which had held that the ICCTA could not be retroactively applied. According to the Defendants, now that a court of appeals has spoken on the issue, this Court, in the absence of any Sixth Circuit authority to the contrary, should reverse its earlier decision to bring the law of this case into conformity with the law as announced by the Eighth Circuit. The Plaintiffs argue, first, that this Court is not bound by the Eighth Circuit decision and, second, that this Court's analysis of the issue was correct, while the Eighth Circuit failed to apply properly Supreme Court precedent.

[2] As a threshold matter, the Court finds that there has been no intervening change in controlling law. Had the Eighth Circuit opinion existed when this Court initially considered the issue of retroactive application of the ICCTA, then the Court could have considered that opinion as helpful guidance. Now that this matter is before the Court on a Motion for Reconsideration, however, the Court is only bound by an opinion that represents controlling law. This Court is only bound by decisions of the U.S. Supreme Court and the Sixth Circuit Court of Appeals. While this Court may, and often does, consider opinions of the other Courts of Appeals, those decisions are not binding and do not require reconsideration of an earlier decision of this Court.

**\*4** [3] The Court also holds that there was no clear error of law in its July 11, 2003, decision. Since the *New Prime* decision is not controlling law for this

Court, the Defendants' only remaining arguments are attempts to re- litigate arguments already considered and rejected by this Court. Both the Eighth Circuit and this Court, in considering the retroactivity of the ICCTA, considered the Supreme Court decision of *Hughes Aircraft Co. v. United States,* 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997). At issue in *Hughes Aircraft* was an amendment to the False Claims Act. Prior to 1986, *qui tam* suits were barred if the information upon which they were based was already known to the government. A 1986 amendment, however, allowed *qui tam* suits even when the relevant information was already known to the government, except under very limited circumstances. *Hughes Aircraft,* 520 U.S. at 941. In finding that the amendment to the False Claims Act altered the substantive rights of the parties by expanding the universe of plaintiffs who could bring claims against the defendant, the *Hughes Aircraft* Court noted that, prior to the promulgation of the new statute, the plaintiff's claim would have been completely barred. *Id.* at 950.

[4] This Court distinguished *Hughes,* finding that, rather than attaching a new disability, the ICCTA simply shifted the power to bring the Defendants into court from the ICC to the owner-operators themselves. The ICCTA did not alter motor carriers' substantive rights or expand the universe of plaintiffs that could bring claims. Prior to January 1, 1996, the Plaintiffs could have pursued their claims by complaining to the ICC. After January 1, 1996, public enforcement ceased, so owner-operators were required to bring actions themselves to vindicate their rights. The Defendants have done nothing to persuade the Court that its earlier reasoning was clearly erroneous. The mere fact that the Defendants now have a Court of Appeals decision in their favor is not sufficient to establish that this Court's reading of Supreme Court precedent is either wrong or unreasonable.

For the reasons stated, the Defendants' Motion for Reconsideration of this Court's July 11, 2003, Order denying the Defendants' Motion for Partial Summary Judgment is **DENIED.**

**B. Motion to Decertify**

*1. Standard of Review*

According to the Defendants, the sole basis for their Motion to Decertify the Class is the decision of the Eighth Circuit in *Owner-Operator Independent Drivers Association, Inc. v. New Prime, Inc.,* 339 F.3d 1001 (8th Cir.2003). The Defendants' Motion is not one for decertification based on new developments in the case. *See Gen. Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) ("Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation."). Likewise, the Defendants' Motion is not based on a "showing that the grounds for granting certification no longer exist or never existed." *Reeb v. Ohio Dep't of Rehab. and Corr.,* 203 F.R.D. 315, 320 (S.D.Ohio 2001) (citing *Gen. Tel. Co.,* 457 U.S. at 160). In other words, the Defendants do not claim that a change in the *case* warrants decertification of the class now, though class certification might have been proper at one point. Rather, the Defendants assert that the Eighth Circuit's *New Prime* opinion proves that this Court misinterpreted the law, and that class certification was never proper in this case. In the alternative, the Defendants appear to argue that the Eighth Circuit opinion represents controlling law, and that this Court is required to change its prior decision certifying the class in order to bring the law of this case into conformity with the law as announced by the Eighth Circuit. In essence, the Defendants' Motion is a Motion for Reconsideration of the Court's September 4, 2001, decision granting class certification and of the Court's February 25, 2002, opinion denying the Defendants' Motion for Reconsideration of the Court's class certification decision. The Court will thus apply the standard set forth above for deciding a motion for reconsideration.

*2. Analysis*

**\*5** [5] As stated above, decisions of the Eighth Circuit are not controlling law for this Court. The Court is thus not required to change an earlier order based on an intervening decision of the Eight Circuit Court of Appeals. Therefore, the Defendants' only basis for seeking decertification of the class is its argument that the Court committed a clear error of law by certifying this class despite individualized damages issues, including the Defendants' purported claims against individual class members for set-offs.

The Defendants argue that this Court should follow the reasoning of the Eighth Circuit, which held, under similar circumstances in *New Prime,* that individual issues predominated over common issues because proof of damages would require the court "to examine each individual class member's account, including offsets, advances, and other items." *New Prime,* 339 F.3d at 1012. The Defendants contend

that the existence of innumerable individualized questions that must be considered in determining damages in this case warrants decertification of the class.

According to the Plaintiffs, this Court has already correctly applied Sixth Circuit precedent in holding that individualized issues related to damages cannot destroy an otherwise cognizable class. The Plaintiffs contend that if individualized damages issues, including any speculative offsets claimed by the Defendants, become overwhelming, then the Court may utilize management tools, such as the appointment of a magistrate or special master to handle individualized damages determinations. The Plaintiffs note that the Defendants are merely putting forth the same arguments that this Court has already rejected, both in its initial decision to certify the class and in its denial of the Defendants' Motion for Reconsideration of that decision.

This Court has already correctly applied Sixth Circuit law in twice rejecting the Defendants' argument that individualized damages issues in this case predominate over questions common to the class. In *Sterling v. Velsicol Chemical Corp.,* 855 F.2d 1188 (6th Cir.1988), the Sixth Circuit discussed the prospect of individualized damages issues in the context of a mass tort case:

> The factual and legal issues of a defendant's liability do not differ dramatically from one plaintiff to the next. No matter how individualized the issues of damages may be, these issues may be reserved for individual treatment with the question of liability tried as a class action. Consequently, the mere fact that questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible.

*Id.* at 1196-97. In its September 4, 2001, decision, this Court applied *Sterling* in deriving two important propositions:

> First, the case dictates that even with the presence of variations in damage awards, as could result here, a class action is still appropriate. Second, even though Arctic and D & A's liability under § 376.12(k) has been established here, *Sterling* makes clear that a class action is still permissible.

**\*6** *Arctic Express,* 2001 U.S. Dist. LEXIS 24963, at \*30.

The Defendants have not established any clear error in the Court's determination of this issue. The mere fact that the Eighth Circuit, in addressing a similar set of circumstances, came out differently than this Court is not sufficient to show that this Court clearly erred in its application of Sixth Circuit law. The Defendants' arguments on the merits are no different than the arguments they have already made to this Court. The Court rejected these arguments twice already, and sees no reason to accept them this time. The Defendants' Motion to Decertify the Class is therefore **DENIED.**

**C. Motion to Strike**

*1. Standard of Review*

The Defendants seek to strike the supplemental declaration of Timothy Brickell pursuant to Local Rule 7.2(E) and Rule 6 of the Federal Rules of Civil Procedure. Local Rule 7.2(E) provides

> When proof of facts not already of record is necessary to support or oppose a motion, all evidence then available shall be discussed in, and submitted no later than, the primary memorandum of the party relying upon such evidence. Evidence used to support a reply memorandum shall be limited to that needed to rebut the positions argued in memoranda in opposition.

S.D. Ohio Civ. R. 7.2(E). If evidence is unavailable at the time of the primary memorandum of a party, Local Rule 7.2(E) specifies a procedure that must be followed. S.D. Ohio Civ. R. 7.2(E).

[6][7] Rule 6 of the Federal Rules of Civil Procedure has been interpreted in a similar manner to Local Rule 7.2(E): Under Rules 6(b) and (d) of the Federal Rules of Civil Procedure, all affidavits in support of a motion must be submitted with the motion unless the court, for cause shown, permits a later filing. *RepublicBank Dallas, N.A. v. First Wis. Nat'l Bank of Milwaukee,* 636 F.Supp. 1470, 1472 (E.D.Wis.1986); *see Peters v. Lincoln Elec. Co.,* 285 F.3d 456, 476 (6th Cir.2002). The purpose of the Rule 6 requirement that cause be shown for affidavits not attached to the original motion is to prevent the moving party from springing new facts on the nonmoving party when it is too late to contest them. *Peters,* 285 F.3d at 476 (quoting *RepublicBank Dallas,* 636 F.Supp. at 1472); *see McGinnis v. Southeast Anesthesia Assocs., P.A.,* 161 F.R.D. 41, 42 (W.D.N.C.1995) ("[T]he clear purpose of Rule 6(d) is to prevent unfair surprise by eleventh hour filings.") (citing *Orsi v. Kirkwood,* 999 F.2d 86 (4th Cir.1993)).

*2. Analysis*

[8] The Defendants contend that the Court should strike the supplemental declaration of Timothy

Brickell because it introduces new evidence without rebutting positions argued by the Defendants in their memorandum in opposition and the Plaintiffs did not seek leave of Court to file it. The Plaintiffs counter that the supplemental declaration does not contain new facts, but rather evidences a ministerial adjustment derived by a simple mathematical calculation based on class members who have opted out of this action. The Plaintiffs contend that the purposes of Rule 6 would not be served by striking this affidavit, especially where the Defendants have ample time to respond to it and have been unable to make any showing of surprise or prejudice.

*7 The most fundamental reason for denying the Defendants' Motion to Strike is that the supplemental declaration was not filed *in support of* either the Plaintiffs' Motion for Summary Judgment or their reply memorandum to that Motion. The fact that 13 class members have opted out of the case, or that the Plaintiffs are now seeking $340,511 less than they were seeking before learning of these opt-outs, does not make it any more (or less) likely that the Court will grant the Plaintiff's Motion for Summary Judgment on Damages. The Plaintiffs are not attempting to introduce new substantive facts in support of their Motion but rather are merely making an anticipated ministerial adjustment, at a time when it is reasonable for them to do so. While the supplemental declaration was filed with the Plaintiffs' reply memorandum, the circumstance of its filing was a mere matter of convenience. The Plaintiffs made a logical and reasonable decision to inform the Court of the adjustment in damages in their reply memorandum, which was filed less than two weeks after the deadline for receipt of exclusion forms. The fact that the declaration, as a matter of convenience, was filed *with* the reply memorandum does not compel the conclusion that it was filed *in support of* that memorandum. In fact, the information contained in Brickell's supplemental declaration is not relevant to any legal argument made by the Plaintiffs, in either their reply memorandum or their original memorandum.

The Defendants' reliance on *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.,* 754 F.2d 404 (1st Cir.1985), is unavailing, as *Arco* is easily distinguished. Indeed, the case here may be analogized to *Peters,* 285 F.3d at 476, where the Sixth Circuit found *Arco* to be inapposite because (1) *Arco* was concerned with the fairness of allowing movants to file a reply brief with affidavits on the day of the motion hearing; (2) the movants in *Arco* could not show cause as to why the affidavits were not filed with the original motion for summary judgment; and (3) there was no such surprise or prejudice in the case at bar, where the non-movant had seven days to examine and reply to the moving party's papers. Here, unlike in *Arco,* the supplemental declaration was filed well in advance of any hearing on the Motion, and the Defendants cannot establish that they have been prejudiced in any way, especially because the declaration does not relate to any substantive facts at issue in the Motion for Summary Judgment.

The purpose behind Rule 6, and presumably Local Rule 7.2(E) as well, is not implicated in this case. The purpose of Rule 6 is to prevent a moving party from unfairly surprising and prejudicing the non-movant by producing evidence of new, substantive facts at the last minute, when the opposing party will have no opportunity to respond. *See McGinnis,* 161 F.R.D. at 42 ("[A] party may not file a motion unsupported by any evidence only to spring the evidence on the opposing party on a later date."). The Defendants here have not in any way been prevented from addressing the Plaintiffs' Motion for Summary Judgment on its merits. The Defendants' Motion to Strike the Supplemental Declaration of Timothy Brickell is, therefore, **DENIED.**

**D. Plaintiff's Motion for Summary Judgment**

*1. Standard of Review*

*8 Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Where the movant produces evidence sufficient to present a *prima facie* case, the burden shifts to the opposing party to present evidence to show that a jury could reasonably rule in its favor. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir.1995). The non-moving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.,* 8 F.3d 335, 339-40 (6th Cir.1993). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The non-moving party, however, "may not rest upon its mere allegations ... but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Celotex,* 477 U.S. at 324; *Searcy v. City of Dayton,* 38 F.3d 282, 286 (6th Cir.1994). The mere existence of a scintilla of evidence in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson,* 477 U.S. at 251; *Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir.1995).

*2. Analysis*

In their Motion for Summary Judgment on Damages, the Plaintiffs seek damages of $16,464,876, plus interest in the amount of $5,922,386. The Plaintiffs have derived this number by adding up the amount collected in maintenance escrows from each of the 2,818 class members. The Plaintiffs contend that they are entitled to recover the full amount contributed into the escrow funds, rather than the net balance after withdrawal of maintenance expenses, because the Defendants' failure to provide a full accounting within 45 days of the termination of these accounts, as required by the regulations, makes it impossible to determine what the actual balance in these accounts was. The Plaintiffs argue that damages sustained by class members based on the Defendants' violation of 49 C.F.R. § 376.12(k) should be defined as the amount collected in escrow less only deductions reported to individual drivers within 45 days of termination. The Plaintiffs assert that, because the Defendants only kept track of maintenance expenses by truck unit number, rather than by owner-operator, accurate calculation of the net balance in any driver's maintenance account is impossible.

**\*9** The Defendants did provide each driver with a final settlement statement within 45 days of termination; however, this statement only recorded the total in maintenance contributions accrued. The Defendants contend that it was their regular practice to mail a Maintenance Breakdown Summary that reported maintenance expenses to each individual driver, both periodically and at or near the termination of a lease. The Plaintiffs, however, contend that these Maintenance Breakdown Summaries only exist in a small number of drivers' files, and that the only evidence that they were provided to all drivers, or ever actually mailed to any driver, is a statement made on information and belief. Such a statement, the Plaintiffs assert, cannot suffice to establish a genuine issue of material fact. In general, the Plaintiffs maintain that the burden of any uncertainty in damages should be borne by the wrongdoer. They argue that they are only required to prove the amount contributed to the maintenance funds and that the Defendants must bear the burden of proving their maintenance expenses in order to obtain a defensive set-off.

The Defendants contend that the Plaintiffs have the sole burden of proving their damages, measured by the net maintenance fund balance of each maintenance escrow account at termination. Given the Maintenance Breakdown Summaries that were regularly provided to each individual truck driver, the net balance of each account is not uncertain and is capable of calculation. The Defendants also assert that there are several factual errors and inconsistencies embedded in the Plaintiffs' calculations. First, the Plaintiffs' own expert issued a report concluding that the Plaintiffs' measure of damages was only $8,182,926. Second, the Plaintiffs' damages claim fails to account for class members who received a $2,000 starting credit towards their maintenance fees, or for class members who received a credit or refund of all or part of the balance of their maintenance funds. Third, at least some of the damages sought by the Plaintiffs consists of maintenance contributions made prior to the statute of limitations period. Finally, the Plaintiffs incorrectly compound interest.

[9] The proper measure of damages is what is necessary to make the plaintiffs whole. *See* Dan B. Dobbs, *Dobbs Law of Remedies* § 3.1 (2d ed. 1993) ("[D]amages is an instrument of corrective justice, an effort to put the plaintiff in his or her rightful position."). The damages should be no more and no less than what is required to put the plaintiffs in the same position they would have occupied had the defendants' wrongdoing not occurred. *Id.* ("[T]he plaintiff should be fully indemnified for his loss, but ... should not recover any windfall."). Had the Defendants here complied with the provisions of 49 C.F.R. § 376.12(k), then the Plaintiff owner-operators, within 45 days of the termination of their respective leases, would have recovered the net balance of their maintenance escrow funds. The measure of damages here is thus the unrecovered amounts remaining in the maintenance escrows at the time of termination for each class member. *See Owner-Operator Indep. Drivers Ass'n v. Arctic*

*Express, Inc.,* 159 F.Supp.2d 1067 (S.D.Ohio 2001) (holding that Defendants had violated 49 C.F.R. § 376.12(k) by failing to return the amount remaining in escrow for owner-operators at time of termination).

**\*10** [10][11] The Plaintiffs' Motion for Summary Judgment on Damages fails for several reasons. The Plaintiffs correctly state the general legal proposition that a wrongdoer should bear the burden of uncertainty as to damages when the uncertainty is a result of the wrongdoer's own wrongful conduct. *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 265, 66 S.Ct. 574, 90 L.Ed. 652 (1946). The Plaintiffs have not cited to any legal authority, however, and this Court is aware of none, to support the novel proposition that a plaintiff may seek summary judgment on damages (in an amount far in excess of any reasonable estimate of damages actually suffered) when the defendant's wrongdoing makes certain determination of damages impossible. The Plaintiffs attempt to use this legal maxim as a sword, whereas every indication in the case law is that its purpose and utility is as a shield. *See Bigelow,* 327 U.S. at 266 (holding that "[t]he comparison of petitioners' receipts before and after respondents' unlawful action impinged on petitioners' business afforded a sufficient basis for the jury's computation of the damage, where the respondents' wrongful action had prevented petitioners from making any more precise proof of the amount of the damage"); *Confed. Tribes of the Warm Springs Reserv. of Or. v. United States,* 248 F.3d 1365, 1371 (Fed.Cir.2001) (trial court was wrong to refuse to award damages on the ground that any award would be speculative where uncertainty as to amount of loss should have been borne by wrongdoer); *Sir Speedy, Inc. v. L & P Graphics, Inc.,* 957 F.2d 1033, 1038-40 (2d Cir.1992) (jury's damages award should not have been set aside where defendant's own misconduct had prevented more precise computation of damages; "[t]he fact that the precise amount of damage may be difficult to ascertain is not fatal to the claim"); *Broan Mfg. Co. v. Associated Distribs., Inc.,* 923 F.2d 1232, 1235-36 (6th Cir.1991) (plaintiffs may only be precluded from recovery based on remote and speculative damages if it is the fact or existence of damages that is speculative, not if merely the amount of damages is uncertain); *Jay Edwards, Inc. v. New Eng. Toyota Distrib., Inc.,* 708 F.2d 814, 821 (1st Cir.1983) ("[W]here the defendant's wrongdoing created the risk of uncertainty [in proving damages], the defendant cannot complain about imprecision."); *Volasco Prods. Co. v. Lloyd A. Fry Roofing Co.,* 308 F.2d 383, 392 (6th Cir.1962) ("[P]laintiff is not to be denied damages simply because they cannot be computed with exactness ."); *Iron Workers Local Union No. 17 Ins. Fund & Its Trustees v. Philip Morris Inc.,* 29 F.Supp.2d 801, 821 (N.D.Ohio 1998) ("Plaintiffs are not barred from recovery where, as here, defendants' violation of RICO precluded the precise ascertainment of the amount of damages attributable to that misconduct by comparison to what would have occurred 'in its absence under freely competitive conditions.' ") (quoting *Bigelow,* 327 U.S. at 264); *Knutson v.. Daily Review, Inc.,* 468 F.Supp. 226, 229 n. 4 (N.D.Cal.1979) (defendants should not profit from their wrongdoing by arguing that plaintiffs' computation of damages is less than exact and precise), *aff'd,* 664 F.2d 112 (9th Cir.1981). In general, plaintiffs have been allowed to use this idea--that a wrongdoer must bear the burden of uncertainty created by the wrongdoing--in defending against defendants who attempt to deny them damages (or have the jury's damages award set aside) based on the speculative or uncertain nature of those damages. It is a maxim rooted in ideas of estoppel, and this Court has seen no indication that it may be used offensively in the manner in which the Plaintiffs suggest.

**\*11** [12] The Plaintiffs need not prove the amount of damages with mathematical certainty. *Sir Speedy,* 957 F.2d at 1038; *Massman Constr. Co. v. Tenn. Valley Auth.,* 769 F.2d 1114, 1123 (6th Cir.1985) (quoting *Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. 180, 351 F.2d 956, 968-69 (Ct.Cl.1965)). The Plaintiffs, however, are required to set forth evidence sufficient to allow the Court to make a reasonable estimate of damages. *Sir Speedy,* 957 F.2d at 1038 ("In order to recover damages, a claimant must present evidence that provides the finder of fact with a reasonable basis upon which to calculate the amount of damages."); *Massman Constr. Co.,* 769 F.2d at 1123 ("It is sufficient if [the plaintiff] furnishes the court with a reasonable basis for computation, even though the result is only approximate."); *Volasco Prods.,* 308 F.2d at 392 ("[T]he evidence must furnish some approximation of the actual damages so that they may be determined with reasonable certainty."); *see Zazu Designs v. L'Oreal, S.A.,* 979 F.2d 499, 505 (7th Cir.1992) ("Although uncertainty created by wrongful acts does not insulate the wrongdoer from liability, 'people who want damages have to prove them ....' ") (quoting *Schiller & Schmidt, Inc. v. Nordisco Corp.,* 969 F.2d 410, 415 (7th Cir.1992)). The Supreme Court, in establishing the rule that a wrongdoer must bear the burden of the risk of uncertainty created by his own wrong, provided the following explanation:

In such a case, even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork. But the jury may make a *just and reasonable estimate* of the damage based on relevant data, and render its verdict accordingly. In such circumstances, "juries are allowed to act on probable and inferential as well as (upon) direct and positive proof."

Bigelow, 327 U.S. at 264 (emphasis added) (quoting Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 564, 51 S.Ct. 248, 75 L.Ed. 544 (1931)); see also Zazu Designs, 979 F.2d at 506 ("Allowance for uncertainty is one thing, and rank speculation another.") (citations omitted).

Although the Plaintiffs are not going to be punished for an inability to prove their damages with absolute certainty, where it was the Defendants' failure to keep proper records that is the cause of that uncertainty, the Plaintiffs must still prove their damages. Since the proper measure of their damages is the net balance in class members' maintenance escrow funds at the time of termination, the Plaintiffs must adduce evidence at trial sufficient to allow the fact finder to make a *just and reasonable estimate* of that sum. The amount for which the Plaintiffs seek summary judgment is not even a remote estimate of the amount of damages actually suffered by the Plaintiffs. The fact that the Plaintiffs' expert has produced a report in which he provides an estimate of the net amount of each driver's maintenance escrow is evidence that the Plaintiffs can make such proof at trial. The unrecovered net balance in the escrow accounts is the amount of damage suffered by the Plaintiffs as a result of the Defendants' wrongdoing. To allow the Plaintiffs to recover more than that sum would be to impose punitive damages on the Defendants. It would also provide the Plaintiffs with an unjustifiable windfall. See LaSalle Talman Bank, F.S.B. v. United States, 317 F.3d 1363, 1371 (Fed.Cir.2003).

*12 Contrary to the Plaintiffs' assertion, the Plaintiff class members were damaged in the amount that they would have received had the Defendants complied with the truth-in-leasing regulations. In other words, they were damaged by the amount actually in the accounts, not by whatever amount the Defendants might have told them was in the accounts. The Defendants, as this Court has already held, violated Section 376.12(k) by not returning the amounts in the maintenance accounts. This Court has not held that the Defendants' violation included a failure to provide an accounting within 45 days of termination. The Plaintiffs thus are not entitled to additional damages based on any such failure to provide an accounting. [FN4]

[13] At trial, the Plaintiffs might be entitled to favorable inferences based on uncertainties created by the Defendants' wrongdoing. *See, e.g., Donovan v. Bierwirth, 754 F.2d 1049, 1056 (2d Cir.1985)* ("Where several alternative investment strategies would have been equally plausible, the court should presume that the funds would have been used in the most profitable of these. The burden of providing that the funds would have earned less than that amount is on the fiduciaries found to be in breach of their duty. Any doubt or ambiguity should be resolved against them.") (as cited in Confed. Tribes of the Warm Springs Reserv. of Or. v. United States, 248 F.3d 1365, 1371 (Fed.Cir.2001)). However, they are not relieved of the responsibility of proving their damages. The Plaintiffs' Motion for Summary Judgment on Damages is therefore **DENIED**.

## IV. CONCLUSION

Based on the foregoing analysis, the Court **DENIES** the Defendants' Motion for Reconsideration; **DENIES** the Defendants' Motion to Decertify the Class; **DENIES** the Defendants' Motion to Strike the Supplemental Declaration of Timothy Brickell; and **DENIES** the Plaintiffs Motion for Summary Judgment on Damages.

**IT IS SO ORDERED.**

> FN1. At this point in the litigation, the Court is intimately familiar with the facts of this case. For a more detailed recitation of the facts, refer to this Court's August 30, 2001, Opinion and Order granting the Plaintiffs' Motion for Partial Summary Judgment and denying the Defendants' Cross-Motion for Summary Judgment. Owner-Operator Indep. Drivers Ass'n, Inc. v. Arctic Express, Inc., 159 F.Supp.2d 1067, 1068-71 (S.D.Ohio 2001). The facts stated here are taken in part from this Court's July 11, 2003, Opinion and Order denying the Defendants' Motion for Partial Summary Judgment.

> FN2. The Court had previously, by Opinion and Order dated March 3, 2000, granted summary judgment to the Defendants on the Plaintiffs' claim for unauthorized deduction of purchase or rental payments under 49

2003 WL 22439878                                                                                                                    Page 1
--- F.Supp.2d ---
**(Cite as: 2003 WL 22439878 (S.D.Ohio))**

C.F.R. § 376.12(i) while denying summary judgment to the Defendants on the Plaintiffs' claim for unauthorized deduction and non-return of escrow funds under 49 C.F.R. § 376.12(k). *Arctic Express,* 87 F.Supp.2d at 829, 831. The Court also, by Opinion and Order dated January 28, 2003, granted the Motion of individual Defendants Richard Durst and Steven Russi to dismiss the claims against them for breach of fiduciary duty.

FN3. In this Opinion, the Court granted the Defendants' Motion for Summary Judgment as to one count of the Complaint and denied it as to the other count. *Arctic Express,* 87 F.Supp.2d at 832. The Court also denied the Defendants' Motion to Dismiss based on the doctrine of primary jurisdiction. *Id.*

FN4. The Court need not decide at this point whether the Defendants created a genuine issue of fact as to actual notification of at least some individual drivers of the net amount in their accounts, via Maintenance Breakdown Summaries, within 45 days of termination.

2003 WL 22439878, 2003 WL 22439878 (S.D.Ohio)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.  Page 2
**(Cite as: 1993 WL 313577 (S.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Margot LUEDKE, Janet Weeks, Patricia Herlihy, Christine Klepeis, Christopher Mulraine, William Worrell, Gladys Healy, Cecilia Tagliaferri, Marie Leicht, Samuel P. Leinbach, Jr., Merlin Leon Tryon, Han S. Oey, and John Green, on behalf of themselves and others similarly situated, Plaintiffs,
v.
DELTA AIR LINES, INC., Defendant and Third-Party Plaintiff,
v.
PAN AM CORPORATION, PAA Corp., Pan American World Airways, Inc., Allmat International, Inc., Pan Am Shuttle, Inc., Pan Am Express, Inc., Alert Management Systems, Inc., Pan Am Commercial Services, Inc., the Official Committee of Unsecured Creditors of Pan Am Corporation, et al., A.I. Leasing II, Inc., Air Line Pilots Association, International, Caterair International Corp., Electronic Services International, Inc., IBJ Schroder Bank & Trust Co., International Brotherhood of Teamsters, Midlantic National Bank, MTU Maintenance Gmbh, Ernest L. Ransome, III, S.G. Warburg Soditic S.A., Transport Workers Union of America, AFL-CIO, United Technologies Corp., and Anthony Ben Walsh, Third-Party Defendants.

No. 92 Civ. 1778 (RPP).

Aug. 10, 1993.

Whitman & Ransom, John E. Tardera, John M. Hadlock, William M. Millard and Jill C. Greenwald, New York City, for plaintiffs.

Davis Polk & Wardwell by Dennis E. Glazer, James H.R. Windels, New York City, for defendant and third-party plaintiff.

OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

*1 The plaintiffs in this case brought an action against Defendant Delta Air Lines, Inc. ("Delta"), seeking lost wages, benefits, and other monetary losses allegedly arising out of Delta's involvement in the failed efforts to reorganize an insolvent Pan Am Corporation and its affiliates ("Pan Am"). In July 1992, the plaintiffs moved under Federal Rule of Civil Procedure 23(c) for an order determining that the action be maintained as a class action on behalf of themselves and all others similarly situated. On March 10, 1993, this court denied the request for certification of the class on the ground that the identification of its members had not been shown to be administratively feasible. *See Luedke v. Delta Air Lines, Inc.,* No. 92 Civ. 1778 (RPP), 1993 WL 213039 (S.D.N.Y. Mar. 10, 1993). The plaintiffs now move for leave to amend their original class action complaint to, *inter alia,* amend and redefine the class definition pursuant to Federal Rule of Civil Procedure 15(a) and for reconsideration of their motion for class certification. For the reasons set forth below, Plaintiffs' motion for reconsideration is granted, but their motion to so amend their complaint is denied as futile.

BACKGROUND

Plaintiffs are former Pan Am employees. Pan Am filed for bankruptcy under Chapter 11 of the Bankruptcy Code on January 8, 1991. While under the protection of the Bankruptcy Court, Pan Am continued to manage and operate its properties as a debtor in possession until December 4, 1991.

Plaintiffs allege that during 1991, Delta reached an agreement with the debtor in possession whereby Pan Am sold Delta its Shuttle and its North Atlantic Routes in exchange for cash and a promise that Delta would provide certain funding to Pan Am while it was in Chapter 11 proceedings and financial support to a reorganized Pan Am ("Pan Am II") once it emerged from such proceedings. Proposed First Amended Class Action Complaint, dated Mar. 25, 1992 [sic], ("Am.Compl.") at ¶ 2. The plaintiffs further allege that from August through November of 1991, Delta gave them numerous assurances that its financial assistance to Pan Am and Pan Am II "would ensure the employment by Pan Am II of at least 6,900 Pan Am employees" *Id.* at ¶ 3; and that the business plan for Pan Am II, submitted by Pan Am and the Creditors Committee to the Bankruptcy Court on October 24, 1991, stated that Pan Am II would "employ approximately 7,500 people." *Id.* at ¶¶ 73, 74.

The original class action complaint defined the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.  
**(Cite as: 1993 WL 313577 (S.D.N.Y.))**

Page 3

plaintiffs' class as "all persons employed by Pan Am or its unions as of December 3, 1991 who were advised that they would be employed by Pan Am II or its unions and/or as a result of their seniority with Pan Am were assured of positions with Pan Am II or its unions and who incurred out of pocket losses and/or lost their jobs and employment benefits as a result of the cessation of Pan Am's business operations on December 4, 1991."  Class Action Complaint, dated Mar. 12, 1992, ("Compl.") at ¶ 21.  The proposed amended complaint changes the original class definition.  The amended class definition includes "all persons actively employed by Pan Am on December 4, 1991 and who incurred out-of-pocket losses and/or lost their jobs and employment benefits as a result of the cessation of Pan Am's business operations on December 4, 1991." Am.Compl. at ¶ 22.  The amended complaint also divides the class into six subclasses pursuant to Rule 23(c)(4) of the Federal Rules of Civil Procedure.  The class is primarily divided by labor force group (i.e., union affiliation or management), and a separate subclass is created for members of the "transition team" (i.e., employees who would have worked with Pan Am II for a period of up to one year but who would not have been offered permanent positions with the company).  The amended complaint adds a plaintiff to represent the "transition team" subclass. *Id.*

 **\*2** According to the amended complaint, the number of active employees on the Pan Am payroll as of December 4, 1991 totals 9,438.  *Id.* at ¶ 84.  [FN1] The complaint further alleges that all of the 9,438 employees would initially have been employed with Pan Am II, but that 1,589 employees would have been employed on a temporary basis as members of the transition team. *Id.*

 With respect to the management subclass, the plaintiffs allege that approximately 1,179 management employees would have been given permanent jobs with Pan Am II.  Am.Compl. at ¶ 22(b); Affidavit of Ramesh K. Punwani, dated Mar. 25, 1993, ("Punwani Aff.") at ¶ ¶ 10, 11.  The plaintiffs contend that each operating department kept lists of those employees who received and accepted written employment offers from Pan Am.  They claim to have retrieved 813 names from such lists and are in the process of searching for more lists.  Punwani Aff. at ¶ ¶ 10, 11; Supplemental Affidavit of Ramesh K. Punwani, dated May 19, 1993, ("Punwani Supp. Aff.") at ¶ 11.

 For the union subclasses, the plaintiffs maintain that the use of seniority rules as well as projected and actual active employee headcounts can be used to identify objectively those employees who were to work at Pan Am II, or at least those employees who would have been offered permanent positions with Pan Am II.  *See* Declaration of John M. Hadlock, dated Mar. 25, 1993, ("Hadlock Decl.") at ¶ 13.

 According to the plaintiffs, the subclass of all active Pan Am flight attendants as of December 4, 1991, would have been offered permanent positions with Pan Am II because the headcount projections for Pan Am II called for 1,425 flight attendants, and there were only 1,381 flight attendants actively employed with Pan Am when it ceased operations.  Punwani Aff. at ¶ 21.

 For flight operations personnel, the plaintiffs claim that all of the 1,156 active airmen employed by Pan Am would have been offered positions with Pan Am II in order to facilitate retraining, and the reduction of the workforce to the steady state of 802 employees, another subclass, would have been based strictly on seniority.  *Id.* at ¶ ¶ 22, 23.

 According to the affidavit of Ramesh Punwani, Chief Financial Officer of Pan Am, all 2,988 Transport Worker's Union ("TWU") employees who were employed as of December 4, 1991, would have been employed with Pan Am II initially, and the reduction of the transport workers to 1,730, another subclass, would have been accomplished by using the seniority rules in the collective bargaining agreement between the TWU and Pan Am.  *Id.* at ¶ ¶ 24, 25.

 The 2,534 active International Brotherhood of Teamsters ("IBT") workers, according to the plaintiffs, would have initially been employed with Pan Am II.  The reduction to the steady state number of 1,729, a subclass, would also have been accomplished using district and system seniority rules.  *Id.* at ¶ ¶ 28-31.

 The final subclass, members of the transition team, would be comprised of those persons who are determined not to be members of the other subclasses.

 **\*3** Based on the redefinition of the class in the proposed amended complaint, Plaintiffs ask this Court to reconsider its initial decision denying class certification.

DISCUSSION

I. STANDARD FOR ALLOWANCE OF AMENDED PLEADINGS AND

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.                                           Page 4
**(Cite as: 1993 WL 313577 (S.D.N.Y.))**

RECONSIDERATION OF CLASS CERTIFICATION

Rule 15(a) stipulates that leave to amend pleadings "shall be freely given when justice so requires." In *Foman v. Davis,* 371 U.S. 178 (1962), the Court stated regarding amended pleadings:

> In the absence of any apparent or declared reason-- such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.--the leave sought should, as the rules require, be freely given.
> *Id.* at 182.

Rule 23(c)(1) of the Federal Rules of Civil Procedure states that an order determining whether a class action is to be maintained "may be conditional, and may be altered or amended before the decision on the merits." Reconsideration of this Court's decision not to certify the class will be undertaken.

II. STANDARD FOR CLASS CERTIFICATION

Before a class action can be maintained, the class must satisfy the prerequisites to a class action enumerated in Rule 23(a) of the Federal Rules of Civil Procedure [FN2], and the class must fall within one of the three categories of class actions as defined by Rule 23(b). *Green v. Wolf Corp.,* 406 F.2d 291, 298 (2d Cir.1968), *cert. denied,* 395 U.S. 977 (1969). Plaintiffs here seek class action certification under category (3), which describes a lawsuit in which:

> the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.
> Fed.R.Civ.P. 23(b)(3).

In addition to these requirements, courts have generally imposed a requirement that the parties seeking class certification present the court with an objective, "administratively feasible" way of identifying class members. *Rios v. Marshall,* 100 F.R.D. 395, 403 (S.D.N.Y.1983) (citing 7 C. Wright and A. Miller, *Federal Practice and Procedure* § 1760, at 581 (1972)); *accord Barnett v. Bowen,* 794 F.2d 17, 23 (2d Cir.1986). A "basic requirement" of a class action under Rule 23 is that class membership must be "capable of ascertainment under some objective standard." *Crosby v. Social Sec. Admin.,* 796 F.2d 576, 580 (1st Cir.1986) (quoting 3B *Moore's Federal Practice* ¶ 23.04 [1], at 23-119). The plaintiffs' initial request for class certification was denied because the plaintiffs had not shown that class members could be identified in an objective, administratively feasible manner. *Luedke v. Delta Air Lines, Inc.,* No. 92 Civ. 1778 (RPP), 1993 WL 213039 (S.D.N.Y. Mar. 10, 1993).

**\*4** In their motion for leave to amend their class action complaint, the plaintiffs have changed their initial class definition; however, the plaintiffs have once again failed to put forward an administratively feasible method of identifying members of the redefined class and its subclasses.

III. DEFINITION OF CLASS AND SUBCLASSES

The parties to this action dispute whether the definitions of the class and subclasses contained in the proposed amended complaint require potential class and subclass members to show that they would have accepted a job offer with Pan Am II, or merely to show that they would have been entitled to such an offer. The class as a whole is defined as those Pan Am employees "who incurred out-of- pocket losses and/or lost their jobs and employment benefits *as a result of* the cessation of Pan Am's business operations." Am.Compl. at ¶ 22 (emphasis added). Any Pan Am employee who would not have accepted a job with a reorganized Pan Am cannot be said to have lost a job or suffered losses "as a result of" the failure of Pan Am's reorganization and, therefore, does not qualify for class membership under the proposed language of the amended complaint. Similarly, in the plaintiffs' proposed amended complaint, the members of the subclasses are defined in terms of those "who were going to continue their employment with Pan Am II." *Id.* The proposed definitions of the class and subclasses thus by their plain language include only those individuals who would have accepted positions with the new entity.

The plaintiffs nevertheless contend that the mere showing of an entitlement to an employment position should be sufficient for the purposes of class and subclass identification. To support their argument, the plaintiffs seek to draw analogies to employment discrimination cases in which class members were able to obtain relief by showing no more than qualification for a job or promotion which they were denied. *See Pettway v. American Cast Iron Pipe Co.,* 681 F.2d 1259, 1266 (11th Cir.1982), *cert dismissed,* 467 U.S. 1247 (1984); *Stewart v. General Motors Corp.,* 542 F.2d 445, 453 (7th Cir.1976), *cert. denied,* 433 U.S. 919 (1977). However, the attempt by the plaintiffs to draw comparisons between themselves

Not Reported in F.Supp. Page 5
**(Cite as: 1993 WL 313577 (S.D.N.Y.))**

and claimants in employment litigation claiming discrimination in hiring or promotion is inappropriate because the underlying assumptions that can be made regarding employment discrimination class actions cannot be made here.

In the employment discrimination class actions cited by the plaintiffs, the courts assumed properly that each applicant for a position would have accepted the position if the position was offered and that each employee would have accepted a promotion if the promotion was offered. The courts were able to make these assumptions partly because they were looking at existing organizations with known employment structures and records of applications for specific positions from specific employees. From this starting point and the existent documentary records, the courts could engage in the "process of recreating the past." *United States v. Teamsters,* 431 U.S. 324, 372 (1977). Here, the plaintiffs are asking this court to predict how each of them would have behaved in the future if offered a position in a restructured entity that never came into existence. Only a small percentage of acceptance letters and few details regarding the specific positions at issue are available to support such a prediction.

*5 *Teamsters,* 431 U.S. 324, a case cited by the plaintiffs [FN3], helps to illustrate these points. In *Teamsters,* the United States initiated litigation against a nationwide carrier of common freight and the Teamsters union alleging a pattern and practice of discrimination against black and Spanish-surnamed individuals in the hiring of line drivers (long distance drivers). These jobs were more desirable than the service or local city driver positions which were lower paying and into which minority applicants were usually hired. In discussing the burden of proof for an employee to be entitled to relief, the court distinguished between those employees who had applied for line-driving jobs and those who had not. The plaintiffs here seek to liken themselves to the applicants for the line driver positions, who were required to prove only that they unsuccessfully applied for a line-driving job. *Id.* at 362. Because they were actively seeking the positions, the court assumed that the job applicants would have taken the positions had they been offered to them. The plaintiffs in this case are, however, more similar to the non-applicants in the *Teamsters* case. The non-applicants in that case had to bear "the not always easy burden of proving that [they] would have applied for the job had it not been for [the employer's discriminatory] practices." *Id.* at 368. The Court noted that although the district court found generally that line-driving jobs are considered more desirable than other driving jobs, the "mere fact of incumbency" does not permit the assumption that an employee would have preferred a line-driving job to his or her current position. *Id.* at 368 n. 52, 369 & n. 53. Here, the mere fact of Plaintiffs' employment with Pan Am I does not support an assumption that they all would have preferred employment with Pan Am II to employment with another entity. [FN4] Accordingly, persons claiming membership in Plaintiffs' class will have to show that they would have accepted jobs with Pan Am II.

IV. METHODS OF IDENTIFICATION

A. CRITERIA FOR IDENTIFYING MEMBERS OF CLASS AS A WHOLE

The plaintiffs' proposed class definition presents this court with two fundamental problems regarding identification of class members. One problem is that the plaintiffs have not provided this court with an administratively feasible method for identifying those members of the class who would have accepted positions with Pan Am II. It was suggested by Plaintiffs at oral argument that the Court could determine who would have actually accepted positions with Pan Am II by having potential class members fill out a questionnaire indicating whether they would have accepted positions with the new entity. This is not a viable solution to the problem. The temptation to want to be included in a lawsuit that may result in monetary awards may influence a former employee to indicate in hindsight that he or she would have accepted a position with Pan Am II even if that would not have been his or her choice at the time. Thus, this court would be subject to an unmanageable number of individual credibility determinations if it were to adopt Plaintiffs' suggestion.

*6 The second problem with the proposed class definition concerns the reliability of Plaintiffs' proposed criteria for identifying members of the class. Delta questions the accuracy and reliability of the headcount projections on which the plaintiffs are relying to describe the hypothetical workforce of Pan Am II, which Plaintiffs claim would have been large enough to accommodate all persons actively employed by Pan Am I on December 4, 1991. Delta's Opp.Mem. at 10-12. To support its argument, Delta points to the admission of the plaintiffs' affiant, Ramesh Punwani, that the headcount projections would have changed after the start of Pan Am II and that they sometimes changed "a couple of times during the day." Punwani Dep. at 28, 69- 70. Indeed, at his deposition, Punwani was asked about

Not Reported in F.Supp.  
**(Cite as: 1993 WL 313577 (S.D.N.Y.))**

Page 6

the possibility of headcount projection revision continuing even after the start of Pan Am II:

Q. Was it your understanding that these revisions to Pan Am II's manpower requirements would continue even after the start of Pan Am II?

A. Absolutely. Any plan of an airline is a constantly changing target and is looked at continuously.

Punwani Dep. at 28.

In a supplemental affidavit filed after his deposition, Punwani contends that the headcount projection number of 7,849 was the "final number *discussed*," and that "there were no *plans* to increase or decrease the ... number." Punwani Supp.Aff. at ¶ 4 (emphasis added). This supplemental affidavit is not inconsistent with Mr. Punwani's deposition testimony. In the supplemental affidavit, Punwani simply does not address the likelihood that the headcount projections would have changed, a likelihood that he indicated in his deposition testimony. Accordingly, the "final" numbers were still subject to constant change and the proposed litigation would involve an attempt to ascertain the nature, number, and timing of such changes after December 4, 1991.

B. CRITERIA FOR IDENTIFYING MEMBERS OF SUBCLASSES

First, with regard to the TWU and the IBT, the plaintiffs propose identifying subclass members by applying union seniority rules and projected headcounts to lists of Pan Am employees. They concede, however, that in addition to seniority, issues such as bumping rights, job classifications, and job qualifications would have played a role in determining who would have been entitled to offers of permanent positions with Pan Am II. Plaintiffs' Reply Mem. at 14. Bumping rights allow for senior union members to "bump" less senior members in other job categories or in other work places. The court would therefore have to make individualized determinations as to how TWU and IBT members would have exercised their bumping rights in order to determine who would have received job offers with Pan Am II. [FN5] In addition, Plaintiffs admit that the method that they suggest for identifying members of these subclasses (i.e., the use of seniority rosters and personnel files) would not factor in whether the employees would have actually accepted positions with Pan Am II. Plaintiffs' Reply Mem at 14; Punwani Aff. at ¶¶ 29-31. Therefore, Plaintiffs have not satisfied their burden of showing an administratively feasible way to identify members of these subclasses.

*7 Second, according to the plaintiffs, the flight operations subclass, which includes the Air Line Pilots Association ("ALPA") and the Flight Engineers International Association ("FEIA"), had 1,156 airmen actively employed by Pan Am on December 4, 1991, and all of the airmen would have been offered at least temporary positions with Pan Am II. Punwani Aff. at ¶ 22. Eventually, however, the number would have been reduced to 802. The plaintiffs claim that the reduction to the steady state number of 802 would have been based strictly on seniority. *Id.* Plaintiffs suggest no administratively feasible and accurate method, however, of showing which members of the subclass, if any, would have accepted positions with Pan Am II.

Third, according to the plaintiffs, on December 4, 1991, 1,381 flight attendants, members of the Independent Union of Flight Attendants (the "IUFA"), were employed with Pan Am I and all would have been offered permanent positions with Pan Am II. *Id.* at ¶ 21. They claim that no reduction would have been necessary because the headcount projections called for 1,425 flight attendants. Still, Plaintiffs offer no viable method for discerning which members of the IUFA subclass, if any, would have accepted positions with Pan Am II.

Turning to the management subclass, according to the plaintiffs, approximately 1,179 management employees would have been offered permanent positions with Pan Am II. They assert that each operating department kept lists of those employees who received and accepted written employment offers. They further contend that they have retrieved 813 names of management employees who received and returned signed employment offer letters. Punwani Aff. at ¶ 11; Punwani Supp.Aff. at ¶ 11. [FN6] Although receipt and acceptance of signed offer letters might be suitably objective evidence of class membership, Plaintiffs do not explain how the remaining 366 subclass members will be identified. Since Plaintiffs offer no method for identifying these 366 members, certification of this subclass would subject this court to at least 366 individualized factual inquiries to determine whether potential members of this subclass would have been offered and would have accepted positions with Pan Am II. Therefore, Plaintiffs have not satisfied their burden of presenting this court with an objective, administratively feasible method of identifying members of the management subclass.

Finally, Plaintiffs propose a transition team subclass

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.  
**(Cite as: 1993 WL 313577 (S.D.N.Y.))**

Page 7

comprised of members of the class who would have worked with Pan Am II for a period not to exceed one year. Because the transition team subclass is to be identified as those employees of Pan Am I as of December 4, 1991, who do not fit into any of the other five subclasses, problems with identifying members of other subclasses carry over onto the transition team. Moreover, Plaintiffs still bear the burden of presenting this court with an administratively feasible method of identifying which potential members of this subclass would have accepted these temporary positions. Plaintiffs have suggested no method to show which potential members of the subclass would have accepted positions with Pan Am II. [FN7]

V. PREDOMINANCE OF INDIVIDUAL QUESTIONS

**\*8** As previously noted, Federal Rule of Civil Procedure 23(b)(3) requires not only that common questions exist as to the proposed class, but that they predominate over individual questions. Clearly, if this class was certified as the plaintiffs have defined it, the individual questions regarding whether each of the 9,502 potential class members would have been offered and accepted a position with Pan Am II would predominate over the common questions regarding the existence of an agreement between Pan Am and Delta, whether there was a breach of that agreement, whether the plaintiffs were intended third party beneficiaries of that agreement, etc.

Because the plaintiffs have failed to present this court with an objective, administratively feasible method for identifying the members of the proposed class and subclasses who would have been offered and accepted positions with Pan Am II, and because common questions do not predominate over individualized inquiries, Plaintiffs' motion for leave to amend the class action complaint is denied as futile.

CONCLUSION

For the reasons set forth above, Plaintiffs' motion for leave to amend the class action complaint is denied. This Court adheres to its prior order denying class certification.

IT IS SO ORDERED.

FN1. The Plaintiffs' reply memorandum, however, increases the number to 9,502. Plaintiffs' Reply Mem. at 1.

FN2. Rule 23(a) provides that one or more members of a class may sue on behalf of all members only if:
(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

FN3. It appears that one reason why the Plaintiffs cite *Teamsters,* 431 U.S. 324, is because the Court in that case indicated that the District Court on remand would be faced with "a substantial number of individualized determinations in deciding which of the minority employees were actual victims of the company's discriminatory practices." *Id. at 371, 372*. Besides the assumptions mentioned above that help distinguish employment discrimination cases, another glaring dissimilarity between *Teamsters* and the case at hand is the sheer number of individualized determinations involved. *Teamsters* dealt with an estimated 400 potential class members. *Id. at 375*. In contrast, the court here is faced with comparative determinations with respect to 9,502 potential class members.

FN4. Pan Am II was not to be a replica of Pan Am I; the new entity would have operated out of a different base, Miami instead of New York, and would have serviced fewer domestic routes than Pan Am I. It is not unreasonable to assume that employees of Pan Am I who would have been offered positions with Pan Am II would have at least considered the change in hub and route structure before deciding to accept such offers. For example, named plaintiff Margot Luedke testified during her deposition that although she would have accepted an offer with Pan Am II in Miami rather than be unemployed, she would have preferred taking a furlough or accepting an offer from Delta if such options became available to her. Luedke Dep. at 190-191. In addition, Russell L. Ray, Jr., CEO of Pan Am I during the fall of 1991, testified that he

Not Reported in F.Supp.  
**(Cite as: 1993 WL 313577 (S.D.N.Y.))**

Page 8

was having difficulty recruiting personnel for Pan Am II. Ray Dep. at 315.

END OF DOCUMENT

FN5. Furthermore, as noted in this Court's prior opinion denying class certification, it is still unclear whether union agreements with Pan Am II were in place at the time Pan Am ceased operations and whether those agreements met with Delta's approval. *See Luedke v. Delta Air Lines, Inc.,* No. 92 Civ. 1778 (RPP), 1993 WL 213039 (S.D.N.Y. Mar. 10, 1993). Plaintiffs maintain only that Pan Am "had reached agreements *in principle* for new or modified collective bargaining agreements with each of its five unions," and that none of these agreements altered union seniority rules. Punwani Aff. at ¶ 20 (emphasis added). Plaintiffs do not assert that any of the unions had ratified these agreements or that the agreements met with Delta's approval, as was apparently required under Pan Am's Plan of Reorganization and Business Plan. *See* Plaintiffs' appendix of exhibits in connection with their original motion for class certification, submitted Nov. 25, 1992, Exhibit 14.

FN6. It should be noted at this juncture, however, that this evidence is disputed by the defendant. Delta points to deposition testimony indicating that at least some of the 813 names that the plaintiffs have retrieved were the result of personal recollections of Pan Am employees and not based purely on signed offer letters. Punwani Dep. at 108-111, 114-115.

FN7. Since the plaintiffs have not provided this court with an administratively feasible method of identifying members of the class, this Court would be faced with thousands of individualized inquiries to determine which members would have accepted positions with Pan Am II. It should be noted that this opinion does not even address the potential conflict of interest problems confronting Plaintiffs' counsel concerning their representation during the determination of which clients are proper members of each subclass.

1993 WL 313577 (S.D.N.Y.)

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works